CRESCENT OIL, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Crescent Oil, Inc. v. Commissioner
Docket No. 1332-76.
United States Tax Court
T.C. Memo 1979-26; 1979 Tax Ct. Memo LEXIS 498; 38 T.C.M. (CCH) 97; T.C.M. (RIA) 79026; January 17, 1979, Filed Ellis D. Bever and Jack D. Flesher, for the petitioner. John Wendell Paul and Daniel S. Morrison, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies of $ 81,847.32 and $ 12,646.18 in petitioner's Federal corporate income tax for the calendar years 1972 and 1973, respectively. Some of the issues raised by the pleadings have been disposed of by the parties, leaving for decision the following: Whether petitioner received the assets of Yellow Cab Company in a tax-free liquidation under section 332, I.R.C. 1954, [1] and, if not, whether petitioner received the assets in a liquidation under section 331(a)(1) or in a taxable exchange for stock it owned in Union Gas Systems, Inc. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner Crescent Oil Company, Inc. (Crescent) *500 is a corporation that had its principal office in Independence, Kansas at the time of the filing of the petition herein. Using an accrual method of accounting, petitioner filed its U.S. Corporation Income Tax Returns for the taxable years 1972 and 1973 with the Internal Revenue Service Center in Austin, Texas. Petitioner is a closely held Kansas corporation that was organized in 1946 by Paul R. Johnson. Since incorporation, all of petitioner's stock has been owned by Paul R. Johnson, now deceased, or by members of his family. During the years at issue herein petitioner was actively engaged in a variety of business activities, including alfalfa dehydrating, distribution of refined oil products, construction and rental of apartments, and other real estate business. At the beginning of the taxable year 1972, petitioner's capital and surplus was $ 1,088,780. Yellow Cab Company, Inc. (Yellow) is a Kansas corporation which, since the time of its incorporation in 1939, has engaged in the operation of taxicabs in Topeka, Kansas. In 1947 petitioner acquired approximately 60 percent of the outstanding voting stock of Yellow. Prior to September 11, 1972, petitioner owned 69.4 percent *501 (8,209 shares) of the stock of Yellow, with an aggregate basis of $ 98,871.50. As of the beginning of 1972, the balance (30.6 percent) of the outstanding Yellow shares was owned by 43 individuals living in 8 states. Yellow's equity capital and surplus as of the beginning of 1972 was $ 333,212. Union Gas System, Inc. (Union) is a Kansas corporation with its principal office in Independence, Kansas. Union was incorporated in 1926. Like petitioner, it was founded by Paul R. Johnson, who had begun a gas distribution business in southeast Kansas in the early 1920's. With several public offerings this business evolved into the present entity of Union. Union's primary business is the production, transmission, and distribution of natural gas to 40 communities in Kansas and northeast Oklahoma. Union stock is traded over the counter. For the fiscal year ended August 31, 1972, Union's capital and surplus, based on book value, was $ 9,466,003. Prior to September 1, 1972, petitioner owned 120,039 shares (17.4 percent) of Union. During the years in issue Harrison F. Johnson (Mr. Johnson), nephew of Paul R. Johnson, was president, chief executive officer, and a director of petitioner, *502 Yellow and Union. By August 4, 1972, Mr. Johnson had formed the intent to bring Yellow's operations within petitioner's corporate structure so as to reduce the proportion of petitioner's income derived from personal holding company sources. A memorandum from Mr. Johnson to the Yellow Cab filed under date of August 4, 1972, reflects this intent. This memorandum states in pertinent part: I had an informal meeting yesterday * * * with Harry Beecroft, Bob Webb and Stanley Macklin. * * * I explained that I wanted to seriously consider an acquisition of Yellow Cab by Crescent so that it could be operated as a Division of Crescent and thus get the benefit of Yellow Cab's revenues as non-personal holding company income. I had previously talked to Bob Webb and told him that I wanted his firm to represent both Crescent and Yellow Cab in this matter and to research the corporate code to see what avenues were open to Crescent in this matter. Briefly the items discussed and comments are enumerated below. 1. Bob felt, and it was agreed by all, that the best procedure would be a merger whereby Crescent offered to buy Yellow Cab stock at a price agreed upon by both Boards and both groups *503 of stockholders in separate meetings. 2. Early discussion was held relative to the price which Crescent should offer -- * * * -- the highest price it had ever sold for was $ 20/share and I had in mind $ 22/share, which was twelve times the average per share earnings of Yellow Cab over the past five years. There were varied views as to what percent of the outstanding stock would be turned in on the basis of $ 22. Both Harry and Bob indicated willingness to turn their stock in but as far as the others were concerned, it was strictly problematical. 3. Later discussion -- the matter of exchanging UGS common which Crescent owns for Yellow Cab stock rather than cash. This was a suggestion by Harry and all agreed it would be much more palatable to the Yellow Cab stockholders than the cash offer of $ 22; first, because most of them had stock at a low price, say $ 5-15 and capital gain tax would be involved, whereas it was the consensus that an exchange of Union common for Yellow common would be non-taxable. We adjourned after lunch with the understanding that Bob Webb would write a memo of procedure as to how the suggested merger could be accomplished with minutes of the directors *504 meeting for each company, as well as stockholders meeting. I explained time was of the essence since Crescent had just lost the alfalfa mill income and that we needed to get additional non-holding company income at once. This matter was not discussed but I am wondering if exchanging Crescent's Union Gas stock for Yellow Cab stock would not involve Crescent in the capital gains tax -- the difference between its cost of Union and, say, the market value of Yellow, which could readily be established at $ 20. In order to avoid such a contingency, I think it would be wise for us to buy in the open market some, if not all, of the stock to make the exchange. The probable Union shares needed: Yellow Cab shares
outstanding
11,823
Crescent owns
8,084
Shares needed
3,739 (on a share/share
exchange basis)
Buying Union Gas shares on an open market would doubtless move price up from 19 1/2 to 20, or better. There are 44 Yellow Cab stockholders, nine of which are already Union Gas stockholders, so if the exchange was made in toto Union would pick up 35 new stockholders, which, frankly, would please me since we are trying to expand our common *505 stock ownership. Mr. Webb sent a letter dated August 7, 1972, to Mr. Johnson with an attachment stating that dissolution of Yellow was unacceptable since upon dissolution minority stockholders would receive their proportionate part of physical assets of the company, but suggesting that the two companies could merge and outlining the procedures for such a merger. Attached to the letter was a memorandum. This memorandum states in part-- Crescent owns 68% of the voting stock of Yellow. Crescent also owns some common stock of Union. Crescent desires to merge with Yellow under the statutes of the State of Kansas. Shareholders of Yellow, other than Crescent, will be paid in cash prior to the merge or in other property of Crescent as part of the merger (such other property being Union stock). Law: For Federal income tax purposes, this is a reorganization as defined in section 368 of the Code if it complies with the applicable state statutes. The last paragraph of Mr. Webb's letter to Mr. Johnson stated as follows: You asked about an immediate exchange between Karen and some of the others, on the one hand, and the corporation on the other. I told you to hold off. That *506 is not right. Crescent may acquire any Yellow stock that it can acquire either by payment of cash or Union stock, or anything else. Any stock thus acquired prior to the merger would have no bearing whatever on the merger except that it would add to Crescent's holdings -- so go ahead. The only thing to be careful about is to be sure that you do not pay in those instances any more for the Yellow stock than you are going to pay to the Yellow holders on the merger because if you do you will have a lot of criticism. Mr. Johnson was of the view that a merger of Crescent with Yellow with an exchange of Yellow shares for shares in petitioner was unacceptable because he did not wish to bring outside interests into petitioner, a family-owned corporation. Mr. Johnson was advised of possible problems with the Securities and Exchange Commission if a tender offer to minority shareholders of Yellow were made, and therefore this approach was rejected. The management of petitioner and Yellow prepared the following proposed timetable for the various steps necessary for a merger as outlined in the enclosure with Mr. Webb's letter to Mr. Johnson dated August 7, 1972: August 16, 1972
Wednesday
Board of Directors Meeting
8 A.M., Crescent Oil, Independence
12 Noon, Yellow Cab, Topeka
August 18, 1972
Friday
Mail notice to stockholders of
Crescent Oil and Yellow Cab
Company for meetings of respective
stockholders
September 11, 1972
Monday
Stockholders Meetings
8 A.M., Crescent Oil, Independence
12 Noon, Yellow Cab, Topeka
September 11, 1972
Monday
File Merger Agreement with
Secretary of State -- merger
becomes effective (hand delivery
by E. E. Wilson)
September 12, 1972
Tuesday
Record in Shawnee and Montgomery
Counties.
Letter to Yellow Cab stockholders
with notice of merger and terms
*507 The management of Yellow and petitioner prepared a worksheet regarding the number of Union shares needed for an exchange for the stock of Yellow. This worksheet showed the following: Union Gas System shares required by Crescent Oil: Yellow Cab Shares
11,823
Less Crescent owned
8,084
Yellow Cab Shares to exchange
3,739
3739 X 1.2=Exchange 4,486.8 UGS
shares
4,486.8
Less unknown share- 12.6
holders 16.8
63.0
16.8
109.2
109.2
Total UGS shares needed for exchange
excluding Crescent and unknown stock-
holders (4)
4,377.6
Less UGS stock purchased
3,571.0
UGS shares needed
806.6
Fred, to cover this, transfer to Crescent the following: G. H. Walker
200 sh at 18 7/8
Burns-Paul
400 sh at 18 1/4
Columbian
249 sh at 17 1/2
849
On August 16, 1972, a special meeting of petitioner's board of directors was held. The minutes of this meeting state in pertinent part: The Chairman announced that various developments had made it desirable to consider a tax-free reorganization with Yellow Cab Co., Inc., a Kansas corporation. Accordingly, the following resolutions were made, seconded, and unanimously adopted: RESOLVED, that the proper *508 officers of Crescent Oil, Inc. be and they hereby are authorized and directed to execute and deliver to Yellow Cab Co., Inc. 14,187.60 shares of the common stock of Union Gas System, Inc., par value $ 3-1/3 per share, in exchange for all of the assets, business and good will of Yellow Cab Co., Inc. in a tax-free reorganization within the meaning of the Internal Revenue Code of 1954 8generally identified as Section 361), and that the number of said shares be reduced by reason of the non-issue of fractional shares; that in lieu of fractional shares there be paid to such shareholders an amount measured by $ 20.00 per share of the stock of Union Gas System, Inc., also granting to such shareholders the right to purchase such fractional share as is necessary to complete a full share of Union Gas System, Inc. stock in lieu of the payment of said cash; and BE IT FURTHER RESOLVED, That the abovementioned Reorganization be carried out as set forth in the attached Plan and Agreement of Reorganization bearing date of August 16, 1972. Also on August 16, 1972, at a special meeting of the board of directors of Yellow held in Topeka, the chairman announced that various developments had made *509 it desirable to consider a tax-free reorganization with Crescent and that upon completion of such reorganization Yellow be liquidated. At this meeting it was resolved, in part, as follows: RESOLVED that the proper officers of Yellow Cab Co., Inc., hereinafter called "Yellow", be and they hereby are authorized and directed to execute and to deliver in the name and on behalf of Yellow the Plan And Agreement Of Reorganization dated August 16, 1972, between Yellow and Crescent Oil, Inc., hereinafter called "Crescent", providing for the transfer of all of the assets, business and good will of Yellow for shares of the common stock of Union Gas System, Inc. (par value $ 3-1/3 per share), and that the proper officers of Yellow are further authorized and directed to execute and to deliver in the name and on behalf of Yellow all papers and documents necessary or desirable and to take all proceedings and to do all acts or things necessary or desirable to comply with the provisions of said Agreement or which otherwise may be necessary or desirable to carry out and complete this transaction. RESOLVED further that the shares of stock of Union will be equal to 1.2 share for each share of outstanding *510 stock of Yellow provided that no fractional share will be issued but, in lieu thereof, cash will be paid measured by $ 20.00 per share of Union, with the right on the part of such Yellow shareholder to purchase additional fractional shares to complete one full share of Union. RESOLVED further that the abovementioned reorganization be carried out as set forth in the attached Plan And Agreement Of Reorganization dated August 16, 1972. RESOLVED further in the judgment of the Board of Directors of Yellow it is deemed to be advisable and for the benefit of Yellow that it be dissolved as soon as practicable upon receipt of the common shares of Union. RESOLVED further that such plan of liquidation be and it hereby is formulated to effect liquidation of the assets and dissolution of Yellow in accordance with the following resolutions: RESOLVED that the proper officers of Yellow be and they hereby are authorized and directed to mail to each stockholder a notice of the adoption of this resolution and of a meeting of the stockholders to take action thereon; and if a majority of the outstanding stock of the corporation shall vote for the proposed dissolution then that such officers *511 be and they hereby are authorized to execute a certificate stating that the dissolution has been authorized in accordance with the provisions of the law and to file such certificate with the Secretary of State of the State of Kansas. RESOLVED that upon receipt of the shares of the common stock of Union such newly acquired assets be distributed proportionately to the stockholders of Yellow. RESOLVED that the actions provided for in the foregoing resolutions providing for the complete liquidation of Yellow and the distribution of all of its assets and the dissolution of Yellow be commenced upon receipt of the newly acquired assets of Yellow and be completed as soon as practicable thereafter and within a period of not more than three (3) months following August 16, 1972. RESOLVED that the proper officers of Yellow be and they hereby are authorized and directed to do all or to cause to be done such further acts and things as they may deem necessary or proper in order to carry out the liquidation and the dissolution of Yellow and fully to effectuate the purposes of the foregoing resolutions. The plan and agreement of reorganization referred to in the minutes of the directors *512 meetings of both Yellow and petitioner are embodied in an instrument dated August 16 and signed by Harrison F. Johnson on behalf of both corporations. The plan contained the following recital: Crescent desires to acquire and Yellow desires to transfer to Crescent all of the assets, properties, business and good will of Yellow in exchange for the transfer, issue and delivery by Crescent to Yellow of 14,187.6 shares of the common stock * * * of Union. Said stock is being distributed by Yellow to its stockholders in exchange for all of the outstanding stock of Yellow which is represented by 11,823 shares of Yellow common stock, all upon the terms and conditions hereinafter set forth, and for the purpose of carrying out a tax-free reorganization within the meaning of the Internal Revenue Code of 1954 [generally identified as section 361]. Yellow desires to provide for the winding up and settling of its affairs in voluntary dissolution and for the distribution to its stockholders of such shares of common stock, par value $ 3-1/3 per share, of Union as hereinafter provided in complete liquidation and complete cancellation and redemption of Yellow's stock. The number of shares of *513 Union is based upon the transfer to Yellow of 1.2 shares of Union stock for each share of Yellow's common stock. No fractional shares of Union will be transferred to Yellow and, to that extent, the gross number of shares on the basis of the foregoing allocation will be reduced. In lieu of fractional shares of Union, the stockholders of Yellow will receive cash having the equivalent of $ 20.00 per share of Union or such stockholders may purchase sufficient additional fractional shares to complete full Union shares, such purchase to be measured at a value of $ 20.00 after the merger. Yellow hereby represents and warrants to Crescent as follows: * * *
The Board of Directors of Yellow has duly approved this Plan And Agreement of Reorganization and the transactions herein contemplated subject to the approval thereof by the stockholders of Yellow as required under the laws of the State of Kansas and has authorized the execution and delivery hereof by Yellow. Crescent represents and warrants to Yellow as follows: * * *
The Board of Directors of Crescent has approved this Plan and Agreement of Reorganization and the transactions herein contemplated subject to the approval *514 thereof by the stockholders of Crescent and has authorized the execution and delivery hereof by Crescent. NOW, THEREFORE, in consideration of the premises and the respective representations and warranties herein set forth, and of the agreements herein contained, Crescent and Yellow hereby agree as follows: I. On the terms and subject to the conditions herein set forth, Yellow hereby agrees to convey, transfer, assign and deliver to Crescent, and Crescent agrees to acquire and accept, as hereinafter provided, all of the assets, properties, business and good will of Yellow. The assets and property to be conveyed, transferred, assigned and delivered to Crescent on the closing date as herein provided shall, without limitation, include all assets and properties of Yellow and all assets and properties thereafter acquired by Yellow. II. Crescent will call a meeting of its shareholders to be held on September 11, 1972, for the purpose of authorizing the conveyance, assignment and transfer by it of the common shares of Union stock to Yellow upon the terms and conditions herein provided. Subject to the conditions herein set forth, from and after the closing date, Crescent shall *515 assume and it agrees to pay, perform and discharge all debts, obligations, contracts and liabilities of Yellow of every kind. III. On the terms and subject to the conditions heretofore set forth, Crescent will assume and deliver to Yellow definitive stock certificates registered in the name of Yellow aggregating 14,187.6 shares of the common stock of Union, less such portion thereof as shall represent fractional shares which otherwise would be due to stockholders of Yellow; * * *. If the whereabouts of any of the shareholders of Yellow are not known, or if for any reason any of the other shareholders of Yellow do not make surrender of their Yellow shares, then the distribution due to such shareholders shall be delivered to Crescent and that distribution, plus all income thereon, shall be set up by Crescent in a special fund to be held in trust for such shareholders and the proper proportion thereof shall be transferred and delivered to such shareholders together with cash, if any due, if and when the whereabouts of the ascertained shareholders shall then be ascertained and if and when all of such shareholders surrender their Yellow stock, all without charge to the shareholders.
*516 IV. The closing under this Plan And Agreement of Reorganization shall take place on September 11, 1972, or at such other time and place as the parties hereto shall agree upon. V. Yellow will call a meeting of its shareholders to be held on September 11, 1972, for the purpose of authorizing 1. the conveyance, assignment, transfer and delivery of all the assets, properties, business and good will of Yellow to Crescent upon the terms and conditions provided herein; and 2. the voluntary dissolution of Yellow. VI. Yellow agrees that promptly upon receipt by it of the stock certificates and the cash for fractional shares, if any, the stock certificates and the cash for fractional shares if any for the common stock of Union to be received by Yellow as provided in Section III hereof, Yellow will distribute all of such shares to its stockholders in complete winding up and liquidation of Yellow, such distribution by Yellow to be made not less than three (3) months following the date of this Plan And Agreement of Reorganization. * * *
This instrument contains the entire agreement between the parties hereto with respect to the transactions contemplated herein. *517 Mr. Johnson mailed to each of the minority shareholders of Yellow a letter dated August 18, 1972, regarding the terms of the proposed merger and the reasons therefor. The letter stated in part as follows: It is therefore, our hope to get this accomplished by offering to exchange with Yellow Cab stockholders 1.2 shares of Union Gas stock for 1.0 shares of Yellow Cab - this would make the exchange equivalent to about $ 24 per share for Yellow based on a market price of $ 20 per share of Union. Union is an over-the-counter security quoted on the National Association of Security Dealers Automated - Quote System (NASDAQ). This exchange will give the Yellow Cab shareholders marketable shares in a growth company which has done remarkably well in its recent diversification program. It will, however, immediately reduce the dividend return from $ 1.60 per share to $ 1.20 per share on the present dividend rates of each company; however, I see Union's dividends increasing and considering the nature of the taxicab and the renta-car business, there is no assurance the $ 1.60 annual dividend can be maintained. When you study the Union Gas System annual report, note Pages 3, 4 and 5, which *518 cover our diversification program from energy fuel to other endeavors; and note in the interim report the percentage of earnings from non-utility sources as well as the improved earnings for the first three quarters. On or about the same date, notice was mailed to the shareholders of Yellow that a special stockholders' meeting would be held for the purpose of considering the merger of Yellow with petitioner. The notice was accompanied by a proxy enclosure by which the shareholder could vote for or against the proposed merger of Yellow and petitioner. The proxy statement included the following: The Board of Directors of the company recommends a vote "for" the proposition. This proxy is solicited on behalf of the management and may be revoked prior to its exercise. On August 21, 1972, Mr. Webb wrote Mr. Johnson to inform the latter that he had prepared a secondary notice and proxy relating to Yellow's dissolution. A handwritten notation on this letter stated "the notice of dissolution might just as well be mailed out now as later -- thus the second notice." On or about August 22, 1972, Mr. Johnson mailed to the Yellow shareholders a notice of a stockholders' meeting to be *519 held on September 11, 1972, to consider and take action upon the proposition to dissolve the company. The notice stated, "We will be glad to have your proxy which is enclosed." A note at the bottom of this letter stated as follows: You are urged to sign and return the enclosed proxy as promptly as possible. If you attend the meeting, you may withdraw the proxy and you may revoke it at any time prior to its exercise. The enclosed proxy which notified the shareholders that management recommended a "FOR" vote also contained the statement that it was solicited by management and "may be revoked prior to its exercise." The shareholders of petitioner were notified on August 18, 1972, that a special meeting would be held on September 11, 1972, to consider the proposition of merging Yellow into petitioner. On August 31, 1972, Charles E. Holman, as trustee for the Margaret I. Holman Trust, a Yellow shareholder, wrote Mr. Johnson to object to the proposed merger and the proposed dissolution. The special meeting of petitioner's stockholders was held, as scheduled, on September 11. By affirmative note of those present the stockholders resolved that the proper officers of petitioner *520 be authorized and directed to execute the plan and agreement of reorganization attached to the minutes of the board of directors meeting of August 16, 1972. On the same day, a special meeting of the Yellow stockholders was held. Of a total of 11,823 outstanding shares, some 11,654.5 were represented in person or by proxy. The minutes of this meeting stated in part as follows: Thereupon, the following resolution was adopted by the stockholders by the affirmative vote of stockholders representing a majority of the outstanding shares of the corporation: "BE IT RESOLVED by the stockholders of Yellow Cab Co., Inc. that the proper officers of Yellow Cab Co., Inc. be and they hereby are authorized and directed to execute the Plan And Agreement of Reorganization which is attached to the minutes of the Board of Directors of the company of August 16, 1972, and that said officers be and they are authorized to execute and deliver to Crescent Oil, Inc. a general assignment of the assets of the company and such other documents as are necessary and proper to effect such merger upon the delivery to this company of the stock of Union Gas System, Inc. as hereinbefore stated." The Chairman then *521 called attention to the other purpose of the meeting, that is, the considering and taking action upon the proposal to dissolve the corporation. Thereupon, the following resolution was adopted by the affirmative vote of stockholders representing more than a majority of the outstanding shares of stock of the corporation: "BE IT RESOLVED by the stockholders of Yellow Cab Co., Inc. that Yellow Cab Co., Inc. be dissolved." On September 11 a copy of the plan and agreement of merger of Yellow into petitioner was filed and recorded in the office of the secretary of State of Kansas. On September 12, 1972, Mr. Johnson mailed to Mr. Webb a letter enclosing a copy of a letter which he proposed to send on September 13, 1972 to each of Yellow's minority stockholders. The letter to the stockholders stated in part: To the Stockholders of YELLOW CAB CO., INC.: On September 11, 1972, the stockholders of Yellow Cab Co., Inc. voted to approve and to adopt the Plan and Agreement of Reorganization dated August 16, 1972, by and between Yellow Cab Co., Inc. and Crescent Oil, Inc. As a result of such action, said merger has become effective. Pursuant to the Reorganization Agreement, each holder *522 of the stock of Yellow Cab should surrender each certificate representing such shares, duly endorsed, or with accompanying executed stock assignment, in each case your signature should be guaranteed by an officer of your local bank and in order to protect the holder he should make the (certificates) payable to Crescent Oil, Inc. and mail to Stanley Macklin, Secretary, Yellow Cab Co., Inc., 4th & Van Buren, Topeka, Kansas 66603. A selfaddressed, stamped envelpe is enclosed for your use. Upon the surrender of such stock (certificates), Crescent Oil, Inc. will issue to you 1.20 shares of the common stock of Union Gas System, Inc. for each share of Yellow Cab stock. Your stock certificate representing the Union Gas System stock will be sent to you within approximately twenty (20) days following the receipt of your surrendered (certificates). In addition, the Yellow shareholders were advised that no fractional shares of Union stock would be issued. In lieu of receiving fractional shares, the shareholders could either purchase a fractional share of Union stock to make a full share or sell any fractional interest in Union stock to which they were entitled by virtue of their Yellow *523 holdings. The letter was signed by Mr. Johnson in his capacity as president of petitioner. No minority shareholder was advised that he would be entitled to receive money or property for the surrender of his Yellow shares other than 1.2 shares of Union for each share of Yellow. On September 11, 1972, the stock of Union traded at $ 18.50 per share bid and $ 19.50 asked. Upon receipt of the letter from Mr. Johnson, all minority stockholders of Yellow surrendered their Yellow stock and received Union stock, with the exception of Mr. Holman. Mr. Holman received $ 20,000 for the surrender of 685.75 shares of Yellow stock owned by the Margaret I. Holman Trust. Subsequent to September 13, 1972, Mr. Stanley Macklin, secretary of Yellow, advised Mr. William Reeder of petitioner as to the number of Yellow shares surrendered by the various stockholders and the number of Union shares and cash that should be issued to the stockholders of Yellow. On October 26, 1972, a certificate certifying that Yellow had filed its resolution of dissolution was signed by the secretary of state for the State of Kansas and the assistant secretary of state. This certificate was filed with the register of *524 deeds of Shawnee County, Kansas on October 30, 1972. In addition, the secretary of state certified that a copy of the certificate of dissolution subsequently filed with the register of deeds, Shawnee County, Kansas, was a true copy of the original on file in the office of the secretary of state. On November 1, 1972, Mr. Webb sent Mr. Johnson a copy of the Corporate Dissolution or Liquidation notice, form 966, required to be filed under section 6043 by every corporation that is to be dissolved or whose stock is to be liquidated in whole or in part. This form, indicating that Yellow had been liquidated under section 331, was filed with the Internal Revenue Service Center in Austin, Texas on November 3, 1972. Petitioner did not transfer to Yellow any Union shares owned by it prior to September 1, 1972, at which time petitioner owned 120,039 shares of Union. Between September 1, 1972 and December 11, 1972, petitioner purchased on the open market 3,571 shares of Union at a cost of $ 64,056.50, of which 3,514 shares were transferred directly to minority shareholders upon the surrender of minority shares in Yellow. Yellow did not endorse any Union stock to petitioner in 1972. All *525 of the property of Yellow, subject to liabilities, was transferred to petitioner within the period October 26 to December 31, 1972. At the time of the transfer of its assets to petitioner, the adjusted bases of the Yellow assets were as follows: Depreciable assets
$ 260,656.46
Land
52,997.36
Cash and current assets
98,240.51
Current liabilities
(33,971.54)
$ 377,922.79
From 1957 through 1971 Yellow was a profitable company. Between 1958 and 1972, Yellow's average yearly earnings were $ 33,931.04. On its Federal corporate income tax return for the year 1972 petitioner reported a net short term capital gain of $ 6,706.45. This sum apparently represents the difference between petitioner's cost basis in the various shares of Union stock that were exchanged for the minority shares of Yellow stock and the fair market value of the Yellow stock received. In his notice of deficiency respondent determined that there was a taxable exchange of Union stock for Yellow assets followed by a taxable liquidation of Yellow with a liquidating distribution to Yellow's shareholders of Union stock resulting in an increase in petitioner's taxable income for the year 1972 *526 in the amount of $ 268,297.05. In its petition to this Court petitioner alleged that there was no exchange of Union stock for the assets and liabilities of Yellow and that as of September 11, 1972, it was the equitable owner of more than 80 percent of the Yellow stock. Respondent in his answer alleged in the alternative that if this Court found that there was no exchange of Union stock for Yellow's assets petitioner's taxable income for the years 1972 and 1973 should be increased in the respective amounts of $ 155,590.24 and $ 19,098.23, even if it were found that petitioner was the equitable owner of all the Yellow stock after the adoption by Yellow of the resolution of merger on September 11, 1972, since the plan of liquidation of Yellow was adopted prior to the time petitioner owned over 80 percent of the yellow stock. OPINION Respondent contends that even though no shares of Union stock were actually transferred by petitioner to Yellow, in substance there was an exchange of 14,187.6 shares of Union stock for all the assets of Yellow and a liquidation of Yellow in which all of its assets, the Union stock, were distributed to its shareholders. Respondent takes the position *527 that both transactions were taxable to petitioner. Respondent relies on the recitations in the various documents incident to the transaction between petitioner and Yellow in support of his position. Respondent argues that by this transaction petitioner realized gain on the transfers of Union stock to Yellow equal to the difference between the fair market value of the Yellow assets and petitioner's basis in the Union stock exchanged therefor and that petitioner realized gain on the second transaction, in an amount equal to the difference between the fair market value of the Union stock received in liquidation and petitioner's basis in its Yellow stock. Respondent contends that section 332 is not applicable to the liquidation of Yellow since petitioner at the date of adoption of the plan of liquidation owned less than 80 percent of the Yellow stock. [2]
*528 The parties have stipulated that petitioner did not transfer any Union shares owned by it prior to September 1, 1972, to Yellow and that Yellow did not endorse any Union stock to petitioner in 1972. Respondent, however, argues that this stipulation refers only to a physical transfer of Union stock. The stipulation, respondent's argument continues, does not preclude a finding that there was a constructive transfer of Union stock to Yellow and a subsequent constructive liquidating distribution by Yellow of this stock back to petitioner and to the minority shareholders. According to respondent's argument, petitioner implemented its plan by means of a one-step transfer of the Union stock directly to the minority shareholders of Yellow, rather than the two-step transfer to Yellow and thence to the Yellow shareholders, because this route was more convenient. The transfer of petitioner's Union shares to Yellow followed by a liquidating distribution of these shares back to petitioner would, respondent alleges, have been a meaningless act, the mere withdrawal of Union shares from its portfolio for immediate replacement. Petitioner contends that, notwithstanding the terms of the documents, *529 there was never any exchange of Union stock for Yellow assets. According to petitioner, there was a purchase by petitioner of the minority shares of Yellow with Union stock. Petitioner admits that this was a taxable transaction to the extent of the difference between the fair market value of the Yellow stock received from the minority Yellow shareholders and petitioner's basis in the Union stock transferred in exchange therefor. Subsequently, petitioner argues, it did acquire Yellow's assets, but this acquisition resulted from a complete liquidation of Yellow, which met the requirements for nonrecognition under section 332. Petitioner argues that a plan of liquidation was adopted on September 11, 1972, at which time petitioner was the equitable owner of more than 80 percent of the Yellow stock by virtue of the proxies. Petitioner asserts that it was never the intention of the parties to exchange Union stock for all of Yellow's assets and then to liquidate Yellow. Mr. Johnson testified that from the outset it was his intention that petitioner acquire all of Yellow's minority shares so that Yellow could be dissolved and operated as a division of petitioner, thereby reducing petitioner's *530 personal holding company income. The memorandum from Mr. Johnson to the Yellow Cab File on August 4, 1972, indicates that at that time the parties contemplated exchanging Union stock only for the 3,739 shares of Yellow held by minority stockholders. At the same time, however, the memorandum states that everyone had agreed that the best vehicle for acquisition of Yellow was a merger. A memorandum accompanying a letter from Mr. Webb to Mr. Johnson dated August 7, 1972, also speaks of a merger between petitioner and Yellow. The memorandum states that shareholders of Yellow other than petitioner will be paid in cash prior to the merger or in Union stock as part of the merger. A worksheet detailing the number of Union shares that petitioner would need for the acquisition of Yellow in order not to use the shares it held with a low basis indicates that petitioner was interested in acquiring only sufficient shares of Union to transfer to the minority shareholders of Yellow. The worksheet reflects that 4,486.8 shares of Union stock, to be exchanged at the rate of 1.2 shares of Union for each share of Yellow, would be needed for the exchange. All of these documents lend support to petitioner's *531 position that from the outset the parties contemplated that petitioner would transfer Union stock only in an amount sufficient to be distributed to the minority shareholders of Yellow. The plan and agreement of reorganization, dated August 16, 1972, however, states that petitioner desires to acquire all the assets of Yellow in exchange for 14,187.6 shares of Union stock, which was to be subsequently distributed by Yellow in dissolution in exchange for all the 11,823 outstanding shares of Yellow stock. This document was subsequently filed for record in the office of the secretary of state of the State of Kansas and in the office of the register of deeds for Shawnee County, Kansas. Petitioner admits that it is difficult to suggest the reasons for drafting and filing such an instrument. The minutes of the special meetings of the boards of directors of Yellow and petitioner on August 16, 1972, both contain resolutions approving the proposed exchange. A resolution contained in the minutes of the Yellow board meeting empowers Yellow's officers to execute and deliver a plan and agreement of reorganization providing for the transfer of all assets, business and goodwill of Yellow in exchange *532 for shares of Union stock and that Yellow be dissolved as soon as practicable upon the receipt of the Union shares. The minutes of petitioner's board meeting contain a provision resolving to carry out the terms of the plan and agreement of reorganization dated August 16, 1972, and a further provision authorizing and directing petitioner to execute and deliver to Yellow 14,187.6 shares of Union stock in exchange for all the assets, business, and goodwill of Yellow. Mr. Johnson testified that these minutes accurately reflect what happened at the directors meetings. The notice sent to each of the Yellow shareholders stated that a special shareholder meeting would be held for the purpose of considering the merger of Yellow into petitioner. This notice states that the "proposed merger anticipates the transfer to Crescent of all the assets of Yellow" in exchange for Union stock. An attached proxy empowered each shareholder to confer authority on a named person who was part of Yellow's management to vote for or against the proposition of merger as referred to in the notice of special meeting. A notice sent to the shareholders of petitioner also refers to an anticipated transfer of all *533 the assets of Yellow in exchange for Union stock. The minutes of the special stockholder meetings of both companies reflect adoption of resolutions approving implementation of the plan and agreement of reorganization of August 16, 1972. At trial Mr. Johnson stated that these minutes accurately reflect what happened at the stockholders' meetings. Mr. Johnson testified that even though recitals of transfers of Union stock to Yellow for Yellow's assets are contained in the documents approved by the directors and shareholders of both corporations, no exchange of Union stock for Yellow assets ever transpired because no such exchange was ever in fact intended. Petitioner contends that in fact it acquired the minority Yellow interests for Union stock and then liquidated Yellow. Petitioner points out that its documents reveal that it wanted to acquire additional Union stock for the exchange. Although petitioner held 120,039 shares of Union, it did not want to use these shares in the exchange. These shares had a low basis, and petitioner did not want to pay a substantial tax on the increase in value of the Union shares used in the exchange. Consequently, petitioner acquired additional *534 Union shares on the open market for the exchange. Petitioner acquired only an additional 3,571 shares of Union, however. This amount approximates the amount needed to exchange for the minority Yellow shares. Petitioner argues that its actions show that it never really intended to exchange Union stock for Yellow assets, since, had such an exchange been contemplated, it would have acquired much more Union stock in advance. Petitioner also points out that no shares of Union were ever transferred by petitioner to Yellow. Rather, the minority shareholders of Yellow acquired their Union shares directly from petitioner. The agreement between petitioner and Yellow whereby petitioner was to acquire the assets of Yellow is referred to as a "merger" and the resolutions of the board of directors of each approved the "merger" of the two corporations. However, it is clear that the transactions outlined are not technically a merger. Under these circumstances, in our view, the transactions that actually occurred should govern the legal consequences. It is clear that petitioner owned sufficient shares of Yellow to force a dissolution of that corporation. However, the officers of petitioner *535 wanted petitioner to acquire all the assets of Yellow, not merely the approximately 70 percent of those assets which it would acquire with the stock it owned. Therefore, petitioner did not want a dissolution of Yellow without assurance that it could acquire all the assets of Yellow. Also, it is clear that consideration was given to petitioner's acquisition of all the stock of Yellow held by the minority shareholders, and this idea was rejected, apparently because Mr. Johnson wanted to have agreement of the minority shareholders of Yellow that they would accept 1.2 shares of Union stock for each share of Yellow stock after the adoption by Yellow of a plan of liquidation and that then all the assets of Yellow would be transferred to petitioner. This is the transaction that in fact took place. However, because Crescent did not acquire the Yellow stock held by the minority shareholders prior to the adoption of the plan of dissolution of Yellow, petitioner did not meet the requirement of section 332(b)(1) that it own 80 percent of the Yellow stock at the time of the adoption of the plan of liquidation. In our view, this is true whether the action of the board of directors of Yellow on *536 August 16, 1972 or the action by the stockholders of Yellow on September 11, 1972 is considered as the adoption of the plan of liquidation. The proxies held by Yellow's management were by their terms revocable until exercised. When these proxies were exercised on September 11, 1972, they were exercised to approve a plan which provided for Yellow's dissolution. Petitioner argues that when the first resolution was adopted on September 11, 1972, it became the equitable owner of the Yellow shares. The first resolution adopted by the shareholders of Yellow approved the plan and agreement adopted by the board of directors on August 16, 1972. This plan and agreement provided both for the transfer of Yellow's assets to petitioner and for the dissolution of Yellow. Accordingly, the liquidation of Yellow was an integral part of the plan and, likewise, an integral part of the first resolution adopted by the Yellow stockholders on September 11, 1972. Therefore, we find that the plan of liquidation was adopted not later than the time on September 11, 1972, when the Yellow shareholders passed the resolution approving the plan and agreement adopted by the directors on August 16, 1972. Whether *537 petitioner had some form of equitable right to the stock held by the minority shareholders after the stockholders adopted the plan of liquidation we need not decide. It is clear on this record that petitioner did not have any such equitable ownership of 80 percent of the stock prior to adoption of the resolution of liquidation. It is clear that petitioner was to acquire actual ownership of the Yellow stock held by minority shareholders only upon the transfer to them of the Union stock. This did not occur until after September 13, 1972. In our view, therefore, petitioner did not own over 80 percent of the stock when the plan of liquidation of Yellow was adopted. Accordingly, section 332 is inapplicable to the liquidation of Yellow and the provisions of section 331[3] govern the tax aspects of the liquidation. At the time the plan of liquidation was adopted, petitioner owned approximately 70 percent of the Yellow stock but prior to the actual distribution of the Yellow assets petitioner acquired the balance of the Yellow stock. Therefore, petitioner received all the Yellow assets in liquidation for all the Yellow stock including both the stock held when the plan of liquidation was *538 adopted and the stock acquired between the time of adoption of the plan and distribution of the Yellow assets. Petitioner contends that if we conclude that it received all the Yellow assets in a liquidation to which section 331 is applicable, the value of the assets it received was not the book value but rather a value measured by $ 24 times the 11,823 shares of Yellow stock outstanding or $ 283,752. In our view the evidence is reasonably clear that the Yellow assets were not worth their $ 377,922.79 basis to Yellow. All the minority shareholders except Mr. Holman agreed to accept 1.2 shares of Union stock for each share of Yellow stock. The asked price of the Union stock at the time was $ 19.50. Petitioner and the minority shareholders of Yellow had used$ 20 a share as the value of the Union stock. If the assets of Yellow *539 were worth $ 377,992.79 then each share of Yellow stock should have been worth nearly $ 32. However, Mr. Holman, the only minority shareholder who demanded cash payment, received only approximately $ 29 a share for his stock. As petitioner points out, this was an isolated transaction important to petitioner to enable it to acquire all the Yellow assets. We agree with petitioner that the best evidence in the record of the fair market value of the Yellow assets is the $ 283,752 computed on the basis of the $ 24 a share paid for the Yellow stock and we hold this to be the value of the assets transferred to petitioner in the liquidation of Yellow. As the parties recognize, our conclusion as to the value of the Yellow assets will require a recomputation of petitioner's deduction for depreciation of the depreciable part of these assets. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.↩
2. Sec. 332 provides in part as follows: (a) General Rule.--No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation. (b) Liquidations to Which Section Applies.--For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if-- (1) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends); and either↩
3. SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS. (a) General Rule.-- (1) Complete liquidations.--Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock. * * *↩